UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERESA PULLEN,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

Case No. 5:21-cv-12289
District Judge Judith E. Levy
Magistrate Judge Kimberly G. Altman

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.     Introduction

This is a social security case.  Plaintiff Theresa Pullen (Pullen) brings this

action under 42 U.S.C. § 405(g), challenging the final decision of Defendant

Commissioner of Social Security (Commissioner) denying her application for

Disability Insurance Benefits (DIB) under the Social Security Act (the Act).  Both

parties have filed summary judgment motions, (ECF Nos. 8, 13), which have been

referred to the undersigned for a Report and Recommendation under 28 U.S.C. §

636(b)(1)(B), (ECF No. 3).

For the reasons set forth below, substantial evidence supports the

Administrative Law Judge's (ALJ's) conclusion that Pullen is not disabled under

the Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 13) be GRANTED, Pullen's Motion for Summary Judgment (ECF No. 8) be DENIED, and that the ALJ's decision be AFFIRMED.

## II.     Background

### A.     Procedural History

Pullen was 60 years old at the time of her alleged onset date of August 9, 2019.  (ECF No. 6, PageID.166).  She previously worked as a janitor and an administrative assistant or secretary and has one year of post-secondary education. (*Id.*, PageID.186).  Pullen alleged disability due to low ejection fraction.[1]  (*Id.*, PageID.184).

After Pullen's application was denied at the initial level on March 26, 2020, (*Id.*, PageID.98-105), she timely requested an administrative hearing, which was held telephonically on August 24, 2020, before the ALJ.  (*Id.*, PageID.36).  Pullen testified at the hearing, as did a vocational expert (VE).  (*Id.*).

Pullen offered the following testimony at the hearing.

---

[1] "Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts.  Because the left ventricle is the heart's main pumping chamber, ejection fraction is usually measured only in the left ventricle (LV).  A normal LV ejection fraction is 55 to 70 percent."  *Lemle v. Comm'r of Soc. Sec.*, No. 11-10295, 2012 WL 1060111, at *3 (E.D. Mich. Jan. 27, 2012), *report and recommendation adopted*, 2012 WL 1059787 (E.D. Mich. Mar. 29, 2012); *see also* https://www.mayoclinic.org/tests-procedures/ekg/expert-answers/ejection-fraction/faq-20058286 (last visited January 18, 2023).

When asked why she would be unable to work, Pullen responded that she had "horrible fatigue," so much so that she "was dozing off" waiting for the telephonic hearing to begin. (*Id*., PageID.56). She also suffered "horrific chest pains" when subjected to any stress, physical or mental. In addition, she experienced fluid retention, gas issues, lack of memory retention, and inability to do more than "light dusting" around the house without having to sit down. (*Id*.).

Pullen described her chest pain as "like someone taking a knife and ramming it into [her] chest . . . twisting it, and then pulling it out." (*Id*., PageID.56-57). She took nitroglycerine (Nitro) three to five times per month to treat her chest pain, often needing to take more than one dose for the pain to subside. (*Id*., PageID.57).

Pullen's heart failure in August of 2019 caused her to experience shortness of breath, which was exacerbated by physical exertion. (*Id*., PageID.58). She walked with a cane due to intermittent dizzy and lightheaded spells, and could only walk halfway around the apartment complex before needing to sit and rest. (*Id*.).

Due to fatigue, Pullen would lay down two to three times during the day for anywhere from 20 minutes to two hours. (*Id*, PageID.60). She napped lightly and did not sleep well at night, even with the assistance of a CPAP machine. (*Id*., PageID.60-61). As for household chores, she was able to do light dusting but could not move things around to vacuum; she could assist with cooking but not cook on her own; and she could clean sinks but was unable to get on the floor to

clean toilets or bathtubs.  (*Id*., PageID.61-62).

On September 2, 2020, the ALJ issued a written decision finding that Pullen was not disabled.  (*Id*., PageID.36-43).  On July 30, 2021, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id*., PageID.22-24).  Pullen timely filed for judicial review of the final decision. (ECF No. 1).

## B.     Medical Evidence

Pullen was admitted to Ascension Providence Hospital on August 9, 2019 due to "severe shortness of breath and orthopnea."  (ECF No. 6, PageID.318).  She was diagnosed with acute respiratory failure secondary to hypertensive crisis and pulmonary edema and stabilized with a nitro drip and diuretics.  (*Id*.).  An echocardiogram revealed an ejection fraction of 15-20%.[2]  (*Id*.).  A cardiac catheterization performed on August 12, 2019 revealed two vessel coronary artery disease, severe left ventricular systolic impairment, and compensated cardiomyopathy with left ventricular filling pressure.  (*Id*., PageID.318, 330).  Four days later, on August 13, 2019, she was medically stable and discharged.  (*Id*., PageID.318).

---

[2] "An ejection fraction measurement under 40 percent may be evidence of heart failure or cardiomyopathy."  https://www.heart.org/en/health-topics/heart-failure/diagnosing-heart-failure/ejection-fraction-heart-failure-measurement (last visited January 18, 2021).

About two weeks later, on August 29, 2019, Pullen began treating with Robert C. Maynard, M.D. (Dr. Maynard), for hyperlipidemia, hypertension, heart disease, and cardiomyopathy.  (*Id.*, PageID.431-434).  She was prescribed Aldactone for blood pressure and heart disease and scheduled for immediate follow-up after her lab results returned.  (*Id.*).  She was also prescribed Lasix for fluid management.  (*Id.*).

At her next visit on October 7, 2019, Dr. Maynard increased her Aldactone dosage from 12.5 to 25 mgs.  (*Id.*, PageID.426).  She continued to see Dr. Maynard every two to three weeks, and on December 4, 2019, she had "improved symptoms greatly but still [was] quite fatigued with any sort of activity."  (*Id.*, PageID.413).  She returned on January 29, 2020, where records reflect left ventricular function improvement from a 25% ejection fraction to 40%.  (*Id.*, PageID.409).  Her physical examination had normal results and her medications were adjusted due to potential side effects.  (*Id.*, PageID.411-412).

Pullen also began treatment with Amanda Vivian, D.O. (Dr. Vivian), at Oakland Internal Medicine on August 20, 2019.  (*Id.*, PageID.382).  Dr. Vivian noted her history of longstanding tobacco abuse, which Pullen reported she ended after her August 9, 2019 hospitalization, and her complaints of constant lightheadedness and dizziness.  (*Id.*, PageID.383).  Pullen reported no chest pain, no shortness of breath when walking or lying down, no palpitations, and no edema.

5

(*Id.*).

Pullen returned to Dr. Vivian six months later, on February 12, 2020.  (*Id.*, PageID.454).  Dr. Vivian noted that Pullen had changed medications, that her ejection fraction had improved to 35-40%, and that she was feeling better overall. (*Id.*, PageID.456).  Pullen again reported no chest pain, no shortness of breath when walking or lying down, no palpitations, and no edema.  (*Id.*).  Her physical examination results were normal, and she was scheduled to return in May 2020. (*Id.*, PageID.456-457).

Pullen underwent five sessions of cardiac rehabilitation in November and December of 2019 as well.  (*Id.*, PageID.500-504).  In her initial session, she rated her pain as a four on a scale of one to ten.  (*Id.*, PageID.504).  She was able to complete five and a half minutes of the six minute walk test, stopping due to complaints of chest tightness.  (*Id.*).  After three minutes of rest, the chest tightness was gone.  (*Id.*).  In her last two sessions, records reflect that Pullen had no cardiac complaints and tolerated the sessions well.  (*Id.*, PageID.500-501).

Pullen also received sleep treatment in September 2019.  (*Id.*, PageID.395). Concern that Pullen might suffer from sleep apnea was noted.  (*Id.*, PageID.397). The results of a sleep test reflected "Mild Airflow Limitation, with air trapping, which is not significantly responsive to bronchodilator."  (*Id.*, PageID.400).

On January 13, 2020, Pullen returned to Ascension Providence Hospital for

6

treatment of a thyroid nodule or "goiter," but noted weight gain and water retention despite being on Lasix, a diuretic.  (*Id.*, PageID.540-542).  She also reported occasional shortness of breath and complained of fatigue, but had no cardiovascular or respiratory symptoms at the time of the visit.  (*Id.*).

On February 29, 2020, Pullen presented to Lakes Urgent Care due to a cough and shortness of breath.  (*Id.*, PageID.477-479).  Upon examination, Pullen was "[t]ired and ill-appearing" and had crackles in the left lower lung and a bothersome cough.  (*Id.*).  She was assessed with pneumonia and prescribed antibiotics and over the counter cold medicine.  (*Id.*).

Pullen returned to Dr. Vivian as scheduled on May 21, 2020, for a follow-up regarding Type 2 diabetes.  (*Id.*, PageID.545).  During a review of symptoms, Pullen reported no sleep disturbances, no significant weight gain or weight loss, no chest pain, no shortness of breath when walking of lying down, no palpitations, no edema, and no cough.  (*Id.*, PageID.547).  Her physical examination was normal, but she noted that she had an episode of sharp chest pain near the end of March which she was able to relieve by taking three nitro pills.  (*Id.*, PageID.547-548). Pullen was instructed to restart 30 mg of Imdur, a chest pain prevention medication, daily; and to go to the emergency room if chest pain recurred.  (*Id.*, PageID.549).

On June 3, 2020, Pullen returned to Dr. Maynard having made progress from

a cardiac standpoint but with continued fatigue, discomfort, and gastrointestinal complaints.  (*Id.*, PageID.517).  She also complained of a "viral like syndrome," with Dr. Maynard noting a decline in functional status and Pullen's intention to seek disability from a cardiac standpoint.  (*Id.*).  Dr. Maynard ordered a stress test which he reviewed the results of with Pullen on July 8, 2020.  (*Id.*, PageID.512). The test indicated an improved ejection fraction of 60% and normal left ventricular function.  (*Id.*).  He found Pullen's transient hypotensive episodes to be "challenging to understand" and questioned "whether this is at all cardiac."  (*Id.*). He made plans for continuing heart failure therapy, but noted that Pullen would "not need to be seen in the office for the current medical problem in the near term." (*Id.*, PageID.512-513).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

8

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps. . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]."  *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Pullen was

9

not disabled under the Act.  At Step One, the ALJ found that Pullen had not

engaged in substantial gainful activity since August 9, 2019, her alleged onset date.

(ECF No. 6, PageID.38).  At Step Two, the ALJ found that she had the severe

impairments of cardiomyopathy, coronary atherosclerosis, congestive heart failure

(CHF), hypertension, and chronic obstructive pulmonary disease (COPD).  (*Id*.).

At Step Three, the ALJ found that none of Pullen's impairments met or medically

equaled a listed impairment.  (*Id*., PageID.39).

The ALJ then assessed Pullen's RFC, concluding that she was capable of

performing

> sedentary work as defined in 20 CFR 404.1567(a) with additional
> limitations.  She can lift no more than ten pounds.  She can sit for six
> hours and stand or walk for two hours in an 8-hour workday.  She can
> occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or
> stairs; but can never climb ladders, ropes, or scaffolds.  She requires a
> work environment free from concentrated levels of dust, fumes,
> chemicals, gases, and other airborne irritants.  She should avoid
> hazards, such as open moving machinery and unprotected heights, but
> ordinary hazards, such as open door and obstacles on the floor, would
> not be precluded.

(*Id*., PageID.39-40).

At Step Four, the ALJ found that Pullen could perform her past relevant as a

secretary as the work was generally performed in the national economy.  (*Id*.,

PageID.42).  As a result, the ALJ concluded that Pullen was not disabled under the

Act.  (*Id*.).

## IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although a court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence."  42 U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted).

In making "substantial evidence" the relevant standard, the law preserves the

11

judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakley*, 581 F.3d at 406 (internal quotation marks omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration (SSA)] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir.

2009) (internal quotation marks omitted).

## V.      Analysis

Pullen argues that substantial evidence does not support the RFC finding,

that the ALJ failed to properly evaluate her subjective symptoms, and that the state

agency medical opinions of record were not properly evaluated.  The

Commissioner responds that substantial evidence supports the RFC finding, the

subjective symptom evaluation, and the medical opinion evaluation.  Each

argument will be addressed in turn below.

### A.      Subjective Symptom Evaluation

Under the Social Security Regulations (SSR), the ALJ was required to

follow a two-step process when evaluating Pullen's subjective symptoms.  20

C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  Under SSR

16-3p, an ALJ must analyze the consistency of the claimant's statements with the

other record evidence, considering her testimony about pain or other symptoms

with the rest of the relevant evidence in the record and factors outlined in SSR 16-

3p.  This analysis and the conclusions drawn from it – formerly termed a

"credibility" determination – can be disturbed only for a "compelling reason."

*Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see also*

*Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)

(explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' . . .

to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' ").

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could reasonably be expected to produce the alleged subjective symptom(s), considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of the symptom(s); (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication received; (6) any means used to relieve the symptom(s); and (7) other factors concerning functional limitations.  20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

Here, the ALJ accurately summarized Pullen's hearing testimony, noting her complaints of chest pain, weakness, fatigue, dizziness, lightheadedness, fluid retention, sleep disturbance, and shortness of breath.  (ECF No. 6, PageID.40). The ALJ also recognized her reports of trouble remembering, concentrating, completing tasks, and getting along with others.  (*Id*.).  However, the ALJ found that Pullen's "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record[.]"  (*Id*.).  The ALJ supported this finding with citations to treatment notes describing her condition as improving and making no mention of physical limitations resulting from her condition.  (*Id*., PageID.41).

14

The ALJ also explained that medical records did not support Pullen's claim of having difficulties with remembering. (*Id*.). Nevertheless, the ALJ credited Pullen's testimony to the extent that her heart condition was exacerbated by exertional activity, and went beyond the recommendations of the state agency physicians in limiting Pullen to sedentary work with additional postural and environmental limitations as described above in the RFC. (*Id*.).

Pullen argues that while her later treatment notes reflect an improvement in her condition, they also reflect continuing health issues that support her statements regarding her symptoms at the hearing. For instance, in June 2020, Pullen saw Dr. Maynard with complaints of chest pains. (*Id*., PageID.530). There, she complained of continued fatigue and discomfort, as well as significant worsening of diarrhea, abdominal pain, and an episode of chest pain that was quite concerning to her. (*Id*.). Dr. Maynard noted that she had high grade chest discomfort, but that this had been relieved by nitroglycerine. (*Id*.). Based on Pullen's statements, Dr. Maynard opined that her functional status had declined. (*Id*.). He also noted that Pullen "has had a viral like syndrome[,]" and mentioned, but did not diagnose, COVID-19. (*Id*.). Dr. Maynard ordered a stress test and a follow-up visit to discuss the results. (*Id*.).

At the follow-up appointment, Dr. Maynard noted that Pullen's ejection fraction had improved to 60% and that her left ventricular function was normal.

(*Id.*, PageID.525).  Pullen had no new complaints at that time and her physical examination rendered normal results.  (*Id.*, PageID.527-528).

The ALJ's summation of the objective medical record is accurate.  She considered the records above and found that Pullen had reported no fatigue in May 2020, made good cardiac progress in June 2020, and had a much-improved ejection fraction in July 2020.  (*Id.*, PageID.41).  Further, the ALJ accurately noted that no medical records supported Pullen's complaint of difficulties with remembering.  (*Id.*).

Moreover, although not mentioned in the ALJ's opinion, there are also no medical records supporting Pullen's claim that her conditions are exacerbated by stress.  Pullen points to complaints in her testimony (*Id.*, PageID.56-57, 63) and function report (*Id.*, PageID.227) regarding stress, but these subjective reports are not supported by any medical records from Pullen's treatment.  Furthermore, in her initial function report, Pullen remarked that she handled stress "ok" though she "tried to avoid it," (*Id.*, PageID.197), and in the third party function report completed by her daughter, it was indicated that Pullen handled stress well, (*Id.*, PageID.210).

Pullen alleges that if her subjective account of her symptoms is fully credited, she would be off-task more than 20% of the time and would leave work in excess of two days per month, both of which would be work-preclusive

16

according to the VE's testimony at the hearing.  (ECF No. 8, PageID.579).

However, Pullen never sought treatment or received medication for her alleged

mental impairments such as difficulty remembering and stress, and these

impairments are not supported by the medical record.  *See Kirkhart v. Comm'r of

Soc. Sec.*, No. 1:18-CV-241, 2019 WL 2314860, at *10 (S.D. Ohio May 31,

2019), *report and recommendation adopted*, 2019 WL 4727373 (S.D. Ohio Sept.

27, 2019) ("The ALJ reasonably relied on a history of no outpatient or inpatient

mental health treatment to find that plaintiff's subjective complaints of debilitating

depression were not fully supported by the record.").  Moreover, Pullen does not

explain which impairment(s) would cause her to be off-task or absent and why they

would have that effect.  This is insufficient to support her claim.  *See Tarjeft v.

Comm'r of Soc. Sec.*, No. 4:20-CV-13306, 2022 WL 4006949, at *7 (E.D. Mich.

May 9, 2022), *report and recommendation adopted*, 2022 WL 4002887 (E.D.

Mich. Sept. 1, 2022).

      In assessing the ALJ's subjective symptom evaluation, this Court must apply

a highly deferential standard of review.  *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d

709, 714 (6th Cir. 2012); *Miller v. Berryhill*, No. 1:18-CV-00140-LLK, 2019 WL

2476743, at *3 (W.D. Ky. June 13, 2019).  The ALJ must assess whether the

claimant's "statements [about the intensity, persistence, and limiting effects of

symptoms] are consistent with objective medical evidence and the other evidence."

SSR 16-3p, 2016 WL 1119029, *6.

Here, the ALJ found that Pullen's account of her symptoms was partially inconsistent with the objective medical evidence. This opinion was supported by specific references and citations to the medical record, as noted above. Furthermore, this assessment was supported by the only medical opinions of record, those of two state agency physicians who made the same finding of partial consistency. Giving Pullen's subjective account partial consideration, the ALJ reasonably limited Pullen's RFC to sedentary work with additional limitations. For the reasons stated above, Pullen has not shown a clear error with the ALJ's analysis. Thus, the ALJ's subjective symptom evaluation should be upheld.

## B.    RFC

Next, Pullen challenges the ALJ's assessed RFC, arguing that it does not account for the full picture of limitations caused by her severe impairments.

In determining a claimant's RFC, an ALJ must consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. 20 C.F.R. § 404.1545(a)(1) (explaining that an RFC must be based on all "relevant evidence"). The "RFC is to be an 'assessment of [a claimant's] remaining capacity for work' once her limitations have been taken into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). In crafting the RFC, the ALJ must consider the restrictions alleged by the claimant. § 404.1545(b-d); SSR 96-8p,

1996 WL 374184, at *6.  "Although a function-by-function analysis is desirable,

SSR 96–8p does not require ALJs to produce such a detailed statement in

writing." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547-548, 2002 WL

343402, at *5 (6th Cir. March 4, 2002) (internal citations omitted). "[T]he ALJ

need only articulate how the evidence in the record supports the RFC

determination, discuss the claimant's ability to perform sustained work-related

activities, and explain the resolution of any inconsistencies in the record." *Id*.

Pullen protests that the RFC contains no limitation on the skill level of work

she can do, noting specifically that her past relevant work as a secretary is

considered skilled work.  Pullen argues that she lacks the capacity for skilled work

due to her intolerance of mental stress, which she says is supported by her function

reports and testimony.  The Commissioner points out that there is no necessary

correlation between the skill level and stress of an occupation.  Even assuming

there was, Pullen's statements regarding stress tolerance are not supported by the

objective medical record and are contradicted to some extent by her first function

report as well as the third party function report from her daughter, considered

above.

"It is well established that an ALJ may pose hypothetical questions to a

vocational expert and is required to incorporate only those limitations accepted as

credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d

1230, 1235 (6th Cir. 1993); *see also Underwood v. Comm'r of Soc. Sec.*, No. 12-12633, 2013 WL 3851002, at *8 (E.D. Mich. July 25, 2013) (noting that the RFC finding only needs to include limitations found credible).  While Pullen cites to a number of medical records to support the connection between her recurring chest pain and her ability to tolerate stress, none of these records make any reference to stress at all.  *See* ECF No. 6, PageID.383, 409, 413, 418, 422, 431, 502, 525, 527, 530, 548.  She goes on to argue that "the records continue to document significant cardiac complaints for which stress would reasonably trigger[,]" but the cardiac event and stress connection is undocumented.  Pullen's RFC argument is essentially "a thinly-veiled invitation for this Court to play doctor," *Gazvoda v. Sec'y of Homeland Sec.*, 258 F. Supp. 3d 799, 814 (E.D. Mich. 2017), which would be improper, *Fox v. Colvin*, No. 15-10968, 2016 WL 837164, at *3 (E.D. Mich. Mar. 4, 2016).  The Court "can only weigh the credibility of medical testimony and evidence proffered by others."  *Schultz v. Sec'y of Health & Hum. Servs.*, 894 F.2d 408 (6th Cir. 1990).

Pullen also argues that the ALJ did not consider the totality of the evidence, contending that the ALJ disregarded Pullen's ongoing complaints of chest pain "in favor of selectively focusing [on] one single visit," which "calls into question the validity of the RFC and limitations[.]"  (ECF No. 8, PageID.574).  To the contrary, the ALJ did consider the exact evidence Pullen says was overlooked, stating,

20

> Over the last few months, treatment notes show occasional reports of chest pain, but indicate that this has resolved with medication (Exhibit 18F). She testified that she continues to take medication whenever she has chest pain, and that this is about three to four times per month. She reported no fatigue in May (Exhibit 18F). She was described as making progress from a cardiac standpoint in June, with her ejection fraction improving to where she fell out of what would be typical defibrillator range. In July 2020, her ejection fraction was 60 percent (Exhibit 15F; 16F).

(ECF No. 6, PageID.41). This summary of the evidence is consistent and does not contradict the records cited by Pullen in favor of a more-restrictive RFC. (*Id.*, PageID.409, 413, 418, 422, 426, 502, 525, 527, 530). In sum, the ALJ considered the entirety of the record in coming to her RFC determination.

Additionally, as will be more thoroughly discussed below, the ALJ relied in part on the state agency physicians' opinions, which were uncontradicted by other opinion evidence and therefore "the best evidence" available to the ALJ. *See Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 294 (6th Cir. 2006). And while Pullen has accurately represented that she continued to suffer intermittent chest pain up to the date of the ALJ's decision, she has not demonstrated how this necessitates a more-restrictive RFC, as is her burden. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008); *Bickerstaff v. Comm'r of Soc. Sec.*, No. 15-cv-10917, 2016 WL 4182756, at *11 (E.D. Mich. July 15, 2016); *Johnson v. Colvin*, No. 14-13236, 2015 WL 4530169, at *6 (E.D. Mich. July 28, 2015).

Lastly, Pullen asks the Court to consider that her frequent changes in

21

medication suggest a lack of symptom control.  (ECF No. 8, PageID.574 (citing

ECF No. 6, PageID.413, 418, 422, 426, 456)).  While the undersigned recognizes

that Pullen's medications were adjusted as reflected in the medical record, it is not

within the Court's purview to determine the extent that this reflects a lack of

symptom control and to what extent this would require further restrictions on

Pullen's already quite-restricted functional capacity.  But the most likely inference

of Pullen's continued adjustments of medication is that she continues to suffer

intermittent chest pain, which is independently reflected by the record and was

properly considered by the ALJ in rendering her RFC.  Overall, the ALJ crafted a

proper RFC consistent with the medical evidence.

### C.     State Agency Physician Opinions

Pullen takes issue with the ALJ's reliance on the medical opinions of two

state agency physicians, which are the only medical opinions of record.  Pullen

argues that the ALJ was not entitled to rely on the opinions while simultaneously

finding them to be somewhat inconsistent with the record.  She also contends that

the opinions are not entitled to persuasive value, as the physicians conducted a

limited review that did not contain the entire record before the ALJ and did not

physically examine her before rendering their opinions.

On March 11, 2020, state agency physician Jennie Rose, M.D. (Dr. Rose),

reviewed Pullen's medical record and SSA submissions to that date.  (*Id*.,

PageID.71-81).  Dr. Rose found Pullen's symptom-related claims to be partially

credible based on the objective medical evidence and opined that Pullen could

occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or

walk six out of eight hours of the workday, sit for six out of eight hours of the

workday, and push or pull any amount within the aforementioned lifting and

carrying restrictions.  (*Id*., PageID.77).  This is consistent with a capability to

perform light work under SSA regulations.  (*Id*., PageID.90).  Dr. Rose also found

that Pullen had some postural and environmental limitations, including only

occasional climbing and balancing, and limited exposure to fumes, odors, gases,

poor ventilation, and occupational hazards such as machinery and heights.  (*Id*.,

PageID.77-78).  Dr. Rose ultimately determined that Pullen could perform her

previous administrative work as it is generally performed in the national economy

at a sedentary level.  (*Id*., PageID.79).

Pullen's medical record was reviewed again on May 26, 2020, by state

agency physician B.D. Choi, M.D. (Dr. Choi).  (*Id*., PageID.83-96).  Dr. Choi was

able to review additional medical records from between March 11 and May 26,

2020, but came to the same conclusions as Dr. Rose regarding Pullen's limitations

and work capacity.  (*Id*.).  The ALJ found these opinions to be somewhat

persuasive, and consistent with the records the physicians were able to review, but

in considering Pullen's later records and her subjective complaints, found a

sedentary exertional capacity to be more appropriate.  (*Id*., PageID.42).

Pullen's contention that a medical opinion must be fully credited by the ALJ in order to support the RFC is off the mark.  A medical opinion need not align directly with the RFC in order for the RFC to be valid.  *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x. 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.") (internal citations omitted); *Davis v. Comm'r of Soc. Sec. Admin.*, No. 2:18-CV-10228, 2019 WL 2051899, at *6 (E.D. Mich. Feb. 19, 2019) *report and recommendation adopted sub nom. Davis v. Comm'r of Soc. Sec.*, 2019 WL 1324239 (E.D. Mich. Mar. 25, 2019) ("Plaintiff's argument that the ALJ erred because he 'did not rely on any physician's opinion in formulating his RFC' has been squarely rejected by the Sixth Circuit.") (internal citations omitted).

An ALJ is "entitled to create an RFC based on his evaluation of the available medical evidence."  *Sparrow v. Comm'r of Soc. Sec.*, No. 15-CV-11397, 2016 WL 1658305, at *7 (E.D. Mich. Mar. 30, 2016), *report and recommendation adopted*, 2016 WL 1640416 (E.D. Mich. Apr. 26, 2016).  Even an opinion given "great weight" by the ALJ need not be incorporated in its entirety.  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Moreover, arguing that the RFC is too restrictive to be in line with

24

a state agency consultant's opinion is "curious and unavailing." *Mosed v. Comm'r of Soc. Sec.*, No. 2:14-CV-14357, 2016 WL 6211288, at *7 (E.D. Mich. Jan. 22, 2016), *report and recommendation adopted*, 2016 WL 1084679 (E.D. Mich. Mar. 21, 2016). *See also Warren v. Comm'r of Soc. Sec.*, No. 13-cv-13523, 2014 WL 3708565, at *4 (E.D. Mich. July 28, 2014) (affirming the ALJ's RFC as supported by substantial evidence, in part because the ALJ assessed a more restrictive RFC than that opined by the claimant's physicians). The ALJ relied in part on the state agency opinions, which found that Pullen could do light work, but also considered Pullen's later medical records and her testimony at the hearing, resulting in a finding that she was limited to sedentary work with additional restrictions. "The fact that the ALJ gave plaintiff the benefit of the doubt in concluding that plaintiff's physical RFC was more limited than the physicians' RFC assessment should not be used to discount the ALJ's determination." *Carstens v. Comm'r of Soc. Sec.* (D.P.R. June 26, 2013); *see also Ross v. Comm'r of Soc. Sec.*, No. CIV.A. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015) ("The fact that the ALJ imposed more restrictions when assessing [the claimant's] RFC than set forth in Dr. Mian's opinion does nothing to discount the ALJ's decision.").

Pullen's contention that nonexamining sources should not be entitled to consideration is also unavailing. Federal or state agency medical consultants are considered to be qualified experts in Social Security disability evaluation. 20

C.F.R. § 404.1513a(b)(1).  An ALJ must, in fact, consider medical evidence from federal or state agency medical consultants, though she is not required to adopt their findings.  *Id.*

Though the length of the treatment relationship and whether the treater has examined the claimant are factors to consider in assessing medical opinions, the most important factors in determining the value of federal or state agency consultant opinions are supportability and consistency.  20 C.F.R. § 404.1520c.  In this matter, there are no treating or examining medical opinions to consider in Pullen's favor, and the state agency consultants' opinions are supported by and consistent with the record as summarized above.  *See* ECF No. 6, PageID.42.

Pullen also complains that the medical opinions are unsupported because the physicians were unable to examine the medical record with regard to treatment Pullen received after they rendered their opinions.  However, as one court put it:

> There will always be a gap between the time the agency experts review the record and give their opinion with respect to the Listing and the time the hearing decision is issued.  Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009).  Pullen does argue that the evidence from June and July of 2020 supports greater restrictions, but as outlined above, the undersigned agrees with the ALJ's analysis of this evidence, which generally shows an improvement in Pullen's

cardiac health.  Furthermore, in considering this new evidence and Pullen's

testimony, the ALJ rendered a more-restrictive RFC than that afforded by

the state agency physicians.  This suggests that the ALJ took into account

the shortcomings of these opinions based on their inability to consider the

later evidence.  Pullen has not shown that an even greater consideration of

the later evidence was warranted or would support an even more restrictive

RFC.

## VI.    Conclusion

The record establishes that Pullen has severe cardiac impairments and is

limited in her ability to perform some substantial gainful activity.  Nonetheless,

substantial evidence supports the ALJ's determination that she can perform her

past relevant work as a secretary as that work is performed in the national economy

at the sedentary level.

Accordingly, it is RECOMMENDED that the Commissioner's motion, (ECF

No. 13), be GRANTED, Pullen's motion, (ECF No. 8), be DENIED, and that the

ALJ's decision be AFFIRMED.

Dated: January 20, 2023                    s/Kimberly G. Altman
Detroit, Michigan                          KIMBERLY G. ALTMAN
                                           United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without

28

merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 20, 2023.


s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager